IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| TROY W. ARCHER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:14-cv-04132-NKL |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**ORDER**

Plaintiff Troy W. Archer appeals the Commissioner of Social Security's final decision denying his application for disability insurance benefits and supplemental security income. The decision is affirmed.

**I.  Background**

Archer was born in 1970 and alleges he became disabled beginning April 1, 2008.[1]

**A.  Medical history and opinion evidence**

On March 15, 2011, Archer had an appointment with Nathan Byam, D.O., for complaints of mild chest tightness of gradual onset over the previous three weeks, but left the doctor's office

---

[1] Archer previously filed applications for disability benefits and SSI on November 5, 2008. An ALJ denied the applications on December 22, 2010. Archer requested review by the Appeals Council, which on December 20, 2011 agreed with the ALJ's decision. Archer did not appeal. In the present case, Archer alleges he has been unable to work since April 1, 2008, a date that is prior to the last final denial of his previous claims by an ALJ, or December 22, 2010. Generally, when a claimant fails to timely request further review, the determination becomes final. *See* 20 C.F.R. §§ 404.987(a) and 416.1487(a). Archer did not address in his brief the effect of the prior case on his present claim that his disability began April 1, 2008. Regardless, any overlap of the prior and present case does not affect the Court's decision in the present one. The medical evidence submitted in the present case postdates December 22, 2010, and the Court is affirming the denial of benefits on the claims' lack of merit.

without being seen.  Archer returned three days later.  He said he had not seen a doctor for over five years, and he requested a referral for occasional chest tightness and shortness of breath.  Dr. Byam's physical examination showed no abnormalities.

On May 2, 2011, William Schlegel, D.O., examined Archer for complaints of increased fatigue and occasional chest discomfort with exertion.  The physical examination noted no cardiac abnormalities.  Dr. Schlegel stated that Archer, who was ten years status-post bypass surgery, "continues to do reasonably well[.]"  [Tr. 395, 399, 422, 441.]  Dr. Schlegel encouraged Archer to "continue with his present level of activity and continue to pursue lifestyle modifications" and adjusted Archer's medication   [Tr. 395, 399, 422, 441.]

Later in May 2011, an echocardiogram showed moderate left ventricular hypertrophy, and a cardiac perfusion study showed findings consistent with ischemia.  Dr. Schlegel performed an angiography on June 2, 2011, which showed diffuse coronary artery disease, and a cardiac catheterization.  A coronary stent was successfully placed.

At an appointment on June 14, 2011, Dr. Schlegel noted Archer was having difficulty paying for medications and "[w]ants me to get him declared for disability."  [Tr. 380, 384, 409.]  A physical examination showed no cardiac abnormalities.  Dr. Schlegel noted Archer "continue[d] to remain stable without any recurrent angina symptoms," was "maintaining his usual level of activity[,] and states he is doing reasonably well."   [Tr. 382, 386, 411.]  Dr. Schlegel encouraged Archer to increase his activity as tolerated.

Three months after the cardiac catheterization and stent placement, on September 13, 2011, Archer returned to Dr. Schlegel. Archer said he had been out of medication for one month. He reported "no chest pain or discomfort[.]"  [Tr. 451.]  Physical examination showed no cardiac abnormalities. Dr. Schlegel noted Archer "continue[d] to remain stable without any recurrent

2

angina symptoms[,]" was "maintaining his usual level of activity and . . . is doing reasonable well[,]" and was "without any recurrent symptoms." [Tr. 454.]

Dr. Schlegel completed a cardiac questionnaire form on March 20, 2012. Where asked on the form to identify clinical findings, laboratory and test results to support Archer's diagnoses, Dr. Schlegel stated "[a]ngina 'whenever I get upset.'" [Tr. 456.] Dr. Schlegel indicated Archer could not perform even "low stress" jobs due to a combination of "low exercise tolerance and 'easily frustrated[,]'" and that Archer's cardiac symptoms frequently interfered with attention and concentration. [Tr. 456.] The doctor noted Archer had "occasional chest pain." [Tr. 457.] He also noted Archer had difficulty obtaining medications. The doctor stated Archer could frequently and occasionally lift ten pounds; should avoid all exposure to extreme temperatures, humidity, and pulmonary irritants; and should avoid moderate exposure to hazards, such as machinery and heights. Dr. Schlegel estimated Archer would be absent from work more than four days per month.

Archer returned to Dr. Schlegel in January 2013 with symptoms of recurrent angina. Dr. Schlegel recommended Archer have a stress test and echocardiogram, but Archer refused for financial reasons.

In May 2013, Archer applied for financial assistance through Dr. Schlegel's office and was approved. Archer had a cardiac stress test on May 23, 2013[2], which showed findings consistent with ischemia. An echocardiogram on May 29, 2013, showed moderate left ventricular hypertrophy. Following review of this testing, Dr. Schlegel recommended cardiac

---

[2] This date is after Archer's disability hearing of May 13, 2013. But the ALJ left the record open for 30 days for Archer to submit additional records. [Tr. 52-53.] Archer subsequently submitted Exhibit B8F, which the ALJ listed as an exhibit in evidence. [Tr. 25.] The exhibit consists of records dated June 5 and 6, 2013, of treatment by Dr. Schegel, and a neurologist, Ahmad Hooshmand, M.D.

3

catheterization, and this procedure was performed the morning of June 5, 2013. Dr. Schlegel's impressions included severe 3-vessel coronary artery disease. Under the "Plans" portion of the report, Dr. Schlegel stated he would order a treadmill stress test, and:

> Then, depending on findings, I may consider talking to a surgeon about a redo bypass versus just continued medical management. At this time I do not see any clear indications for actual surgical revascularization again, although I am sure he is having symptoms. Will increase his medications for now. He certainly needs better diabetic and lipid control.

[Tr. 474.]

The same day as Archer's cardiac catheterization, at lunchtime after the procedure, Archer "suddenly noted he was not able to feel the left side of his face. [His] condition evolved to left-sided weakness." [Tr. 475.] He was admitted for further assessment and seen by Ahmad Hooshmand, M.D., a neurologist. A chest x-ray showed no acute cardiopulmonary process. [Tr. 476.] An MRI showed "acute mildly hemorrhagic infarction involving the frontal lobe…[and] a small acute lunar infarct involving the left cerebellar hemisphere. These infarcts are likely embolic in origin…." [Tr. 478-79.] Dr. Hooshmand diagnosed an ischemic cerebrovascular accident. [Tr. 476.]

### B. Archer's testimony

The hearing was held in May 2013. Archer testified he lives with his wife and step-children, ages 12 and 14, and did some household chores such as laundry and occasional lawn mowing on a riding mower. He drives to visit his mother almost daily, a 30-mile round trip, and feeds her animals and watches television. He drives her to Wal-Mart, and usually goes in the store and walks with her. The Wal-Mart trips take about an hour or hour and a half.

From 2008 through January 2012, Archer worked at a gas station 28 hours per week, consisting of three 8-hour shifts and one 4-hour shift. He left that job because he did not want to

4

continue to work overnight shifts. He last worked from April to December 2012, at another gas station, for 24 hours per week. He had disagreements with the manager and was fired for eating items designated to be thrown away. At his gas station jobs, he operated the cash register, helped customers, stocked the cooler, stocked shelves, unpacked boxes of supplies, and occasionally lifted and moved boxes of supplies, which required him to continuously stand or walk. [Tr. 32; 321.] He also cleaned at the gas stations. He had difficulty taking care of trash in the gas station parking lot when it was hot outside. [Tr. 57.]

Archer testified that he sometimes experienced chest "discomfort," and his energy level was "low." [Tr. 53, 59.] He had difficulty dealing with temperature extremes. He also had difficulty with stressful situations, such as being around large groups of people. Archer stated he did not see Dr. Schlegel in 2012 because his wife had lost her job with health insurance and he was unable to afford treatment. He said he was covered by insurance again in November 2012.

### C. The ALJ's decision

The ALJ found Archer has severe impairments of coronary artery disease, cardiomyopathy, hypertension, obesity, obstructive sleep apnea, and diabetes mellitus. The ALJ also concluded Archer did not meet Listing 4.04, Ischemic Heart Disease.

The ALJ found Herring has the residual functional capacity to perform:

> [A] range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). He can lift and/or carry ten pounds both occasionally and frequently; can stand or walk for two hours during an eight-hour workday; can sit for six hours during an eight-hour workday; cannot climb ladders, ropes, or scaffolds; can occasionally crouch or crawl; should avoid concentrated exposure to unprotected heights or dangerous moving machinery, dusts, odors, gases, fumes, or other pulmonary irritants, and temperature extremes.

[Tr. 14.] The ALJ found Archer's subjective complaints were not entirely credible. [Tr. 15-19.]

5

The ALJ concluded Archer could perform representative jobs, existing in significant numbers in the national economy, of cashier, surveillance system monitor, telemarketer, document preparer, and ampoule sealer, and that Archer is not disabled.

## II. Discussion

Archer argues that the ALJ failed to consider evidence submitted after the hearing and failed to give appropriate weight to the opinion of a treating physician, Dr. Schlegel. Archer argues that the RFC is not supported by substantial evidence on the record as a whole. He asks for reversal and remand for award of benefits or for further proceedings.

The Commissioner's findings are reversed "only if they are not supported by substantial evidence or result from an error of law." *Byers v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). Substantial evidence is less than a preponderance of the evidence, but enough that a reasonable mind might accept it as adequate to support the Commissioner's conclusions. *See Juszczyk v. Astrue,* 542 F.3d 626, 631 (8th Cir. 2008). "If substantial evidence supports the Commissioner's conclusions, [the Court] does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Byers*, 687 at 915.

### A. Credibility determination

Archer does not explicitly challenge the ALJ's credibility determination, but it affects the explicit challenges Archer does raise. Therefore, the Court will first review the credibility determination.

When an ALJ determines a claimant is not credible and decides to reject the claimant's statements, the ALJ must provide specific reasons for the credibility finding. *See Delrosa v. Sullivan*, 922 F.2d 480, 485 (8th Cir. 1991); *Prince v. Bowen*, 894 F.2d 283, 296 (8th Cir. 1990). The ALJ must specifically consider evidence related to the claimant's work record; daily

6

activities; "the duration, frequency and intensity of pain; the precipitating and aggravating factors; the dosage and side effects of medication; and functional restrictions." *Delrosa*, 922 F.2d at 485 (*citing Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984)); *see also* 20 C.F.R. 404.1529 and 416.929 (codifying the *Polaski* factors). *Compare Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006) ("Subjective complaints may be discounted if the evidence as a whole is inconsistent with the claimant's testimony.")

Credibility is "primarily for the ALJ to decide, not the courts." *Moore v. Astrue,* 572 F.3d 520, 524 (8th Cir. 2009) (internal quotation and citation omitted). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [the reviewing court] will normally defer to the ALJ's credibility determination." *Halverson v. Astrue,* 600 F.3d 922, 931 (8th Cir. 2010) (internal quotation and citation omitted).

Here, the ALJ cited and considered the *Polaski* factors. As for activities of daily living, the ALJ noted the jobs Archer held at gas stations from 2008 to January 2012, and April to December 2012, during the alleged period of disability. The jobs required Archer to continuously stand and walk, run a cash register and help customers, clean, stock shelves, and move boxes. There is no evidence he received special accommodations at the jobs, and he left them for reasons unrelated to his alleged disability. He also participated in non-work related activities during the period of alleged disability, such as driving 30 miles almost every day to his mother's house and helping her with shopping and her pets, and doing his laundry and mowing his yard with a riding lawn mower. Such activities are inconsistent with subjective complaints of disabling conditions. *See Medhaug v. Astrue,* 578 F.3d 805, 817 (8th Cir. 2009) (activities such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking are inconsistent with subjective complaints of disabling pain).

7

Further undermining Archer's credibility, the ALJ noted that notwithstanding Archer's allegation of onset of disability on April 1, 2008, he sought no treatment for his alleged impairments until March 2011, and at the time had not sought treatment for a total of five years. Archer complains he lacked insurance for a period of 10 or fewer months in 2012, but not that he lacked it prior to March 2011. Moreover, the totality of the record of his treatment shows his cardiac condition was stable with minimal symptoms, except for exacerbations in May 2011 and May 2013. The May 2011 exacerbation was resolved by placement of a stent. He did not complain of chest pain or discomfort to a doctor again until January 2013. He had a cardiac catheterization in June 2013. His cardiologist identified a reasonable target for a future bypass graft, should it be necessary, but did not see a need for surgical revascularization at the time, and decided to increase Archer's medications, and perform additional testing. The cardiologist noted Archer needed better diabetic and lipid control. There is no medical evidence of further treatment ordered or limitations placed on Archer following the June 2013 procedure. Such level and frequency of treatment is inconsistent with Archer's allegations. *See Kamann v. Colvin,* 721 F.3d 945, 95051 (8th Cir. 2013) (ALJ properly considered that claimant was seen "relatively infrequently for his impairments despite his allegations of disabling symptoms"); *Casey v. Astrue,* 503 F.3d 687, 693 (8th Cir. 2007) (claimant sought treatment "far less frequently than one would expect based on the pain that [he] alleges").

The ALJ articulated the inconsistencies upon which he relied in discrediting Archer's testimony about his subjective complaints, and substantial evidence in the record as a whole supports the ALJ's credibility finding.

The post-hearing record relating to an acute neurologic episode Archer experienced in June 2013 does not affect the foregoing. The record shows that after his June 2013 cardiac

8

Case 2:14-cv-04132-NKL   Document 18   Filed 05/14/15   Page 8 of 14

catheterization, Archer suddenly developed new symptoms, left-sided numbness and weakness. A chest x-ray showed no cardiopulmonary abnormalities. His neurologist diagnosed an ischemic cerebrovascular accident. Archer submitted no other records concerning the episode. The ALJ did not explicitly mention it, nor did the Commissioner in her brief. But this evidence neither supports nor detracts from the ALJ's credibility finding. Archer's treatment records prior to June 2013 contain no mention of such neurologic issues, nor did Archer mention any in his testimony.

### B. Weight given Dr. Schlegel's medical opinion

Archer argues the ALJ should not have rejected the March 2012 cardiac questionnaire completed by treating source Dr. Schlegel.

All medical opinion evidence, regardless of source, is weighed by examining the length of the treatment relationship and frequency of examination, nature and extent of the treatment relationship, supportability of the opinion including medical signs and laboratory findings, consistency with the record as a whole, specialization of the medical source, and other factors such as the source's understanding of the disability programs. 20 C.F.R. § 404.1527; 20 C.F.R. § 404.927.

If a treating physician's opinion concerning the nature and severity of a claimant's impairment "is well-supported by medically acceptable clinical and laboratory techniques and is not inconsistent with the other substantial evidence in [the] case record," it is given "controlling weight." 20 C.F.R. § 404.1527. But an "ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (internal quotation omitted). *See also Blackburn v. Colvin,* 761 F.3d 853, 860 (8th Cir. 201) (same).

9

Dr. Schlegel opined in March 2012 that Archer could frequently and occasionally lift ten pounds and should avoid all exposure to extreme temperatures, humidity, and pulmonary irritants, and avoid moderate exposure to hazards. The ALJ's RFC finding and the jobs identified by the vocational expert account for such limitations.

But Dr. Schlegel further opined Archer could not perform even low stress jobs; that his cardiac symptoms frequently interfered with attention and concentration; and that he would be absent from work more than four days per month. As of April 2012, Dr. Schlegel had treated Archer times since May 2011, including performing a cardiac catheterization. Dr. Schlegel noted in the treatment record that Archer "continue[d] to do reasonably well," despite his failure to seek treatment for several years. [Tr. 395, 399, 422, 441.] The doctor recommended Archer continue his present activity level prior to the cardiac catheterization and stent placement. After those procedures, Dr. Schlegel recommended Archer increase his activity and noted Archer had no recurrent symptoms. At the time Dr. Schlegel filled out the questionnaire, he had not examined Archer for six months, and the last time he had seen Archer, Archer had no recurrent symptoms and no chest pain. Dr. Schlegel's opinion as to Archer's limitations regarding stress, attention and concentration, and absenteeism are unsupported by the treatment records. *See Halverson*, 600 F.3d at 930 ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes.") (*citing Davidson v. Astrue*, 578 F.3d 838, 842 (8th Cir. 2009)).

Further undermining Dr. Schlegel's opinion is that it is inconsistent with Archer's activities, including that Archer was working 24 to 28 hours per week from 2008 through January 2012, and April to December 2012. Archer left both jobs for reasons unrelated to his alleged disability, and the record contains no evidence that he had any problems performing

them due to stress, attention and concentration, or absenteeism. The opinion is also inconsistent with Archer's other testimony concerning his daily activities. *See Owen v. Astrue*, 551 F.3d 792, 799 (8th Cir. 2008) (rejecting limitations found by treating physician where the claimant's "activities of daily living do not reflect" them); *Medhaug v. Astrue*, 578 F.3d 805, 815 (8th Cir. 2009) (rejecting conclusory statements in treating physician's letter stating that the claimant "cannot sit for a long period of time without getting up to move around," and that "it [would be] almost impossible for him to hold a full time job"; statements were contradicted by claimant's testimony at the administrative hearing that he was currently employed as a school bus driver).

Finally, the language of Dr. Schlegel's opinion demonstrates it was based on Archer's subjective allegations, which is an appropriate reason to give a treating physician's opinion less weight. *Kirby v. Astrue,* 500 F.3d 705, 709 (8th Cir. 2007) ("The ALJ was entitled to give less weight to [treating physician's] opinion, because it was based largely on [the claimant's] subjective complaints rather than on objective medical evidence."). Where asked on the form to identify clinical findings, and laboratory and test results supporting Archer's diagnoses, Dr. Schlegel quoted Archer's own statements about having chest pain, a symptom that was not supported by the treatment records, or Archer's work history or testimony.

In view of the foregoing, the Court will not disturb the ALJ's decision to reject Dr. Schlegel's opinion.

### C. Support for the RFC

Archer also argues that the RFC is not based on substantial evidence. Archer argues in particular that the post-hearing records he submitted in the 30-day window the ALJ left open for him to submit additional records were new, material, and related to the period preceding the ALJ's decision, and demonstrate the ALJ's decision is not supported by substantial evidence on

11

the record as a whole.

Residual functional capacity is what a claimant can still do despite his limitations. 20 C.F.R. § 404.1545(a). It is an assessment based upon all of the relevant evidence including a claimant's description of his limitations, observations by treating and examining physicians or other persons, and medical records. 20 C.F.R. § 404.1545(a). Put another way, the RFC must be upon all of the substantial evidence, and must be supported by at least some medical evidence. *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000). It is the ALJ's responsibility to determine RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and the claimant's description of his limitations. *See* 20 C.F.R. § 416.945; *Lacroix v. Barnhart,* 465 F.3d 881, 887 (8th Cir.2006).

ALJs sometimes leave a record open after hearing for a claimant to submit additional records. But the fact that records are submitted post-hearing does not automatically mean an ALJ must order additional testing, find for a claimant, further develop the record, or take any other steps before reaching a decision. *See McNeal v. Astrue,* 2013 WL 865592, at *6 (W.D. Mo. March 7, 2013) (affirming denial of benefits; among other reasons, post-hearing evidence did not affect RFC, nor did it require further development of record because other evidence in record provided sufficient basis for the ALJ's decision) (*citing Stormo v. Barnhart,* 377 F.3d 801, 806 (8th Cir. 2004)); and *Auck v. Astrue,* 2008 WL 3979263, at *4 (W.D. Mo. Aug. 25, 2008) (affirming denial of benefits; post-hearing evidence did not affect RFC).[3] Moreover, an ALJ is not required to discuss in a decision every piece of evidence in the record, including

---

[3] Regarding the post-hearing evidence, Archer cites case law concerning review of new records submitted to the Appeals Council after an unfavorable ALJ decision. [Doc. 14, pp. 10-11.] That case law does not apply here. Following the unfavorable ALJ decision, Archer submitted a written argument to the Appeals Council, but not any new records. [Tr. 5.] He submitted the new records to the ALJ in the 30-day, post-hearing window.

records submitted post-hearing. *Auck*, 2008 WL 3979263, at *4.

Here, the decision reflects that the ALJ considered the entirety of the record, including what Archer submitted after the hearing, Exhibit B8F. The ALJ included it in the List of Exhibits [Tr. 25], and cited it in the decision [Tr. 16]. The ALJ was not required to discuss Exhibit B8F in its entirety, or even at all, but in the context of addressing Archer's cardiac complaint, explicitly noted and discussed Archer's recent presentation "with some increased symptomology" [Tr. 16], as set out in Exhibit B8F. The ALJ further explained that "the efficacy of prior treatment and the lack of an indication that more significant treatment is necessary support a finding that [Archer's] cardiac complaints will be resolved within 12 months of their onset." [*Id.*][4]

The post-hearing record relating to the acute neurologic episode Archer experienced in June 2013 after his cardiac catheterization does not require further development of the record for the ALJ to make a decision, nor does it affect the RFC. According to the exhibit, a chest x-ray showed no cardiopulmonary abnormalities; Archer's neurologist diagnosed an ischemic cerebrovascular accident. Archer submitted no other records concerning the episode—whether to the ALJ during the 30-day window, or to the Appeals Council. Evidence of medical treatment received post-hearing that does not suggest the issues could cause significant functional limitation or affect the RFC does not require reversal, even if not discussed by the ALJ in the decision. *Auck,* 2008 WL 3979263, at *4.

The RFC is supported by substantial evidence on the record as a whole, including Archer's treatment records and evidence of impairments and restrictions the ALJ found credible.

---

[4] To establish entitlement to benefits, a claimant must show he is unable to engage in any substantial gainful activity by reason of a medically determinable impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d) and 1382c.

The record overall notes a stable cardiac condition with minimal symptoms over time, and two exacerbations that were treated, without any evidence of constant medical attention in follow-up. The RFC is consistent with Archer's own testimony about his work history during the alleged period of disability; his sensitivity to temperature extremes; and his daily activities. The ALJ tailored the RFC to provide for sedentary work, with limitations on lifting and carrying; standing, walking, and sitting; and crouching and crawling; and no climbing. The RFC further provides that temperature extremes are to be avoided, as well as exposure to pulmonary irritants, unprotected heights, and moving machinery.

The ALJ's RFC determination is supported by substantial evidence on the record as a whole, including medical evidence, and will not be disturbed.

### III. Conclusion

The Commissioner's decision is affirmed.

s/ Nanette K. Laughrey<br>
NANETTE K. LAUGHREY<br>
United States District Judge

Dated: May 14, 2015
Jefferson City, Missouri